Filed 5/5/14  Jacqueline C. v. Superior Court CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JACQUELINE C., | D064903 |
| Petitioner, | |
| v. | (San Diego County Super. Ct. No. EJ3247) |
| THE SUPERIOR COURT OF SAN DIEGO COUNTY, | |
| Respondent; | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Real Party in Interest. | |

PROCEEDINGS in mandate after referral to a Welfare and Institutions Code section 366.26 hearing.  Gary M. Bubis, Judge.  Petition denied.

Dependency Legal Group of San Diego and John P. McCurley for Petitioner Jacqueline C.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel and Lisa M. Maldonado, Deputy County Counsel, for Real Party in Interest San Diego County Health and Human Services Agency.

Dependency Legal Group of San Diego and Amanda J. Gonzales for Minor.

Jacqueline C. seeks review of a juvenile court order setting a hearing under Welfare and Institutions Code section 366.26.[1]  Jacqueline challenges the finding that she was offered or provided reasonable reunification services.  We deny the petition.

FACTUAL AND PROCEDURAL BACKGROUND

Jacqueline C. is the mother of Nicholas C., who is now 13 years old.  Nicholas has Lennox-Gastaut syndrome, a severe form of epilepsy that is usually accompanied by mental retardation.  As a result, Nicholas suffers from "significant neurological, cognitive, emotional and behavioral challenges which impact him and those who care for him."  He has a history of serious behavioral problems, including aggression, tantrums and running away, and functions at an emotional and psychological age of a two- to four-year-old child.

The early history of Nicholas's dependency proceedings is detailed in our nonpublished opinion, *Jacqueline C. v. Superior Court* (Aug. 22, 2012, D061394).  Briefly, Nicholas was in the foster care system in Michigan until Jacqueline, his older sister, adopted him and another sibling.  Nicholas was removed from Jacqueline's care in August 2010 due to her inability to manage his destructive behaviors, which included running away, trying to set Jacqueline on fire, threatening her with a knife, destroying furniture, and urinating and defecating in his bedroom.  Jacqueline's family reunification plan required her to participate in individual therapy and parenting education classes.  She had unsupervised visitation with Nicholas until January 2011, when he left her home while she was in the bathroom.

---

[1]     All further statutory references are to the Welfare and Institutions Code.

After searching for a suitable foster care home for Nicholas for seven months, the San Diego County Health and Human Services Agency (the Agency) placed him in a special needs foster care home in January 2011, with support services. When Nicholas was first placed with his new caregivers, the extent and severity of his dysfunction exceeded what was typically manageable within foster home settings. For the most part, Nicholas's foster care parents were able to stabilize his behaviors. Nicholas had a strong need for structure and did not respond well to changes in his routine. He continued to demonstrate a consistent pattern of aggression and tantrums after visits with Jacqueline.

At the 12-month review hearing in February 2012, the juvenile court terminated reunification services and set a section 366.26 hearing. Jacqueline filed a petition under California Rules of Court, rule 8.452[2] asserting that she had not been offered or provided reasonable reunification services. (*Jacqueline C. v. Superior Court*, *supra*, D061394.)

This court concluded that Jacqueline had not been offered or provided with reasonable reunification services because her case plan was not carefully tailored to provide the training, education and services that were needed to parent a special needs child; her therapist's treatment plan did not pass TERM team review; there had been delays implementing other recommended services; and she had not consistently been offered or provided reasonable visitation services. In August 2012, this court issued a writ of mandate directing the juvenile court to direct the Agency "to develop a case plan that provides Jacqueline with comprehensive, specialized training for caregivers of children with special

---

2       Further rule references are to the California Rules of Court.

needs, and provide other reasonable services to her, including visitation, for a minimum of six months." (*Jacqueline C. v. Superior Court*, *supra*, D061394.)

In October 2012, the Agency developed a new family reunification plan to provide Jacqueline with the same services that Nicholas's foster family received through the Agency, Toward Maximum Independence (TMI). Jacqueline was assigned a TMI team to work with her in her home. Once services began, TMI would refer Jacqueline and Nicholas for conjoint therapy with the San Diego Center for Children's Foster Family Agency Stabilization and Treatment (FFAST) program. The plan anticipated that TMI would work with Jacqueline and Nicholas three to four times a month, including in-home visits at least twice a month. In addition, the new case plan required Jacqueline to undergo a psychological evaluation and participate in individual therapy.

The Agency implemented the first step of the plan which was to provide therapeutic support to Nicholas, who insisted that he did not want to visit Jacqueline. His therapist used strategies that were designed to help Nicholas manage his anxiety, decrease his aggressive behavior, and help him become less fearful about seeing Jacqueline. However, whenever Jacqueline's name was mentioned, Nicholas became irritable, his face turned bright red, and he said that he did not want to "be taken away" from his foster family. He expressed homicidal ideation toward Jacqueline. In January, the therapist recommended that efforts continue to prepare Nicholas for conjoint therapy with Jacqueline. However, when Nicholas talked about seeing Jacqueline, he would cry hysterically, kick, scream, and yell. In early February, while driving back from therapy, he pulled the foster mother's hair and would not let go, nearly causing her to have an accident. Nicholas had nightmares that he was being taken away from his foster family by monsters and by Jacqueline. At school, he tried to hit

4

and bite his teacher. Nicholas's therapist reported that he was deteriorating and was not able to tolerate exposure to the mention of Jacqueline's name.

The Agency filed a section 388 petition asking the juvenile court to issue a no contact order between Nicholas and Jacqueline, and to stop therapy directed at facilitating visits.

Jacqueline filed a section 388 petition requesting an independent case evaluation to determine what services were required for her to reunify with Nicholas.

On May 16, the juvenile court granted the Agency's request for a no contact order and also granted Jacqueline's request for an independent case evaluation.

The juvenile court held a contested 18-month review hearing on November 4. The Agency recommended that the court terminate reunification services and set a section 366.26 hearing. The court admitted in evidence the Agency's reports and statements that Jacqueline made in e-mails to the social worker and other persons who were involved in Nicholas's case.

According to Jacqueline's TMI team, she made only minimal efforts to participate in their services. She was routinely late to appointments and complained that she was tired or did not feel well. Jacqueline did not keep in touch with Nicholas by sending him letters or birthday presents. She did not pursue educational opportunities for parents of special needs children. Mary Heed, the behavioral consultant who was working with Jacqueline through the TMI program, said that Jacqueline was being given the tools that she needed to effectively parent Nicholas but would not "pick them up."

An evaluating psychologist concluded that Jacqueline was suffering from a generalized anxiety disorder. She was very independent and did not have an adequate support system. Jacqueline would not ask others for help.

5

Robert Geffner, Ph.D. and his team reported that they had made several attempts to interview Jacqueline, but she made little effort to meet with them, and further reported that her behavior was consistent with other providers' statements regarding her level of involvement with services. Without Jacqueline's involvement and improved motivation and efforts, Dr. Geffner could not recommend reunification. In Dr. Geffner's view, Jacqueline had demonstrated that she was not ready to fully participate in her case plan. Once she worked through the issues that were impeding her ability to properly participate in the reunification process, she should participate in conjoint therapy with Nicholas as well as in parenting education for special needs children. Jacqueline appeared to be unaware of Nicholas's developmental stages, safety requirements, and needs. In view of Jacqueline's lack of participation, Dr. Geffner concluded that it was in Nicholas's best interest to remain with his foster parents. Dr. Geffner interviewed Nicholas and asked him about Jacqueline. Nicholas firmly and abruptly told the evaluator that he did not want to talk about her. When pressed for a reason, Nicholas said Jacqueline was "mean" and quickly changed the subject.

The juvenile court found that reasonable services had been provided, stating:

> "The evidence speaks for itself. I'm not going to get too deeply into this. As to the visitation orders, I know that the Court of Appeal said visits shall occur. This court based on all of the circumstances could not order those visits to occur because I just could not do it based on the evidence. I'm supposed to always act in the best interests of the child and [visitation] would not be in the best interests of this child, and you know, just a few observations, first of all, my heart goes out to this mother. I mean, she took on a huge, huge responsibility and then her husband dies. She was put in a bad situation, and I think she made really good efforts. I think it would be overwhelming. In that same regard, I don't know why Nicholas all of a sudden became so averse to her, but he is as a toddler and has a lot of emotional problems."

6

The juvenile court terminated family reunification services and set a section 366.26 hearing.

Jacqueline petitioned for review of the juvenile court's findings and orders. (§ 366.26, subd. (*l*); rule 8.452.) She asks this court to vacate the findings and orders terminating reunification services and remand the case with orders to provide six months of family reunification services. This court issued an order to show cause and the Agency responded.

## DISCUSSION

### *There Is Substantial Evidence to Support the Finding that Reasonable Services Were Offered or Provided to Jacqueline*

Jacqueline argues that the services that were offered to her could not be fully implemented without visitation. She contends that the Agency was required to provide her with "hands-on training" with Nicholas, and that without visitation, she was deprived of a meaningful opportunity to reunify with her son. Jacqueline maintains that the juvenile court improperly delegated its authority by failing to make or enforce an order for visitation. She further argues that the juvenile court erred when it suspended visitation in May 2013.

At an 18-month status review hearing for a child, if the court does not return the child to the physical custody of the parent, the court shall continue the case only if it finds that there is a substantial probability that the child will be returned to the physical custody of his or her parent and safely maintained in the home within the extended period of time, or that reasonable services have not been provided to the parent. (§ 366.21, subds. (f) & (g).) Unlike the standard of proof for a reasonable services finding at a six-month or 12-month review hearing, which requires a finding by clear and convincing evidence, the standard of

7

proof required for a reasonable services finding at an 18-month review hearing is preponderance of the evidence. (*Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 595.) At the 18-month hearing, the authority of the juvenile court to set a section 366.26 hearing is not conditioned on a reasonable services finding. (*Denny H. v. Superior Court* (2005) 131 Cal.App.4th 1501, 1511.)

To support a finding that reasonable services were offered or provided, "the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult . . . ." (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.) Reunification services should be tailored to the particular needs of the family. (*David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 793.) The child welfare agency must make a good faith effort to provide reasonable services responsive to each family's unique needs. (*Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1010.) The adequacy of a reunification plan and the reasonableness of the agency's efforts are judged according to the circumstances of each case. (*Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1164.) "The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.)

A normal part of reunification services is visitation between the parent and his or her child. (*In re Nicholas B.* (2001) 88 Cal.App.4th 1126, 1138.) Visitation must be as frequent as possible, consistent with the well-being of the child. (§ 362.1, subd. (a)(1)(A).) "At the same time, visitation orders must provide for 'flexibility in response to the changing needs

8

of the child and to dynamic family circumstances.' [Citation.] 'In addition, the parents' interest in the care, custody and companionship of their children is not to be maintained at the child's expense; the child's input and refusal and the possible adverse consequences if a visit is forced against the child's will are factors to be considered in administering visitation.' [Citation.]" (*In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1356.) "No visitation order shall jeopardize the safety of the child." (§ 362.1, subd. (a)(1)(B).)

We review a reasonable services finding to determine if it is supported by substantial evidence. (*In re Christina L.* (1992) 3 Cal.App.4th 404, 414.) We do not resolve conflicts in the evidence, pass on the credibility of witnesses or determine where the preponderance of the evidence lies. (*Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969.) The burden is on the petitioner to show the evidence is insufficient to support the juvenile court's findings. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

In view of this court's directive to offer reasonable visitation services to the family, and Nicholas's opposition to visiting Jacqueline, the juvenile court acted within its discretion when it fashioned a visitation order that relied on therapeutic modalities. (See *In re Anna S.* (2010) 180 Cal.App.4th 1489, 1501-1502 [generally, on remand, the juvenile court fashions orders after assessing the child's current circumstances and needs].) We are not persuaded by Jacqueline's contention that the juvenile court delegated its authority to determine visitation. The record shows that the juvenile court ordered a plan to provide therapeutic services to Nicholas to facilitate visitation. However, Nicholas began to deteriorate after therapy began, becoming combative, anxious and aggressive. The social worker acknowledged that it was difficult to determine why Nicholas felt so strongly about not visiting Jacqueline, but it was evident from his behaviors that he was not able to tolerate any

contact with or discussion about her. Because of these developments, the Agency filed a section 388 petition asking the juvenile court to modify its previous visitation order. The juvenile court has the power to suspend a visitation plan when continuing it would be harmful to a child's emotional well-being. (*In re Brittany C.*, *supra*, 191 Cal.App.4th at p. 1357.) Here, the juvenile court's decision to suspend visitation was in response to Nicholas's deteriorating emotional well-being. This was not an impermissible delegation of judicial authority to a third party to determine whether visitation is to occur. (*In re Hunter S.* (2006) 142 Cal.App.4th 1497, 1505.)

With respect to Jacqueline's claim that the juvenile court did not make a finding on the record that visitation would be detrimental to Nicholas, both the Agency and minor's counsel correctly point out that Jacqueline did not appeal from the order suspending visitation and has thus forfeited her right to claim error on appeal. To the extent that her claim relates to the reasonable services finding, the record shows that the attempt to provide visitation to Jacqueline had extremely adverse effects on Nicholas's behaviors, including homicidal ideation, aggression, bedwetting, nightmares, and hysterical crying. The record shows that the juvenile court was acutely aware of Nicholas's reaction to any proposed visitation with Jacqueline, and that the no contact order was based on the court's determination that the previous visitation plan was detrimental to Nicholas.

Following remittitur of this court's opinion in *Jacqueline C. v. Superior Court*, *supra*, D061394, the juvenile court ordered a reunification plan that was reasonably tailored to the needs of the family. Jacqueline was offered or provided services through the Agency, the San Diego Regional Center, the TMI agency, the FFAST program and other educational programs for parents of children with special needs. She also participated in a

10

psychological evaluation and individual therapy. In addition to those services and others, Nicholas received therapeutic support services to facilitate visitation. Nicholas's tremendous needs for emotional stability and security impeded the full implementation of that plan.

The record shows that the Agency made a good faith effort to provide reasonable services that were responsive to the family's unique needs, including offering visitation. (*Mark N. v. Superior Court*, *supra*, 60 Cal.App.4th at p. 1010.) However, Jacqueline's receptivity to services was mixed, and she was not willing to engage in all the services that were offered to her. Significantly, when Jacqueline was contacted to arrange visitation, she would not commit to visiting Nicholas on Saturday mornings. Further, she refused to participate in an independent case evaluation that she had requested. We conclude that there is substantial evidence to support the juvenile court's finding that reasonable services were offered or provided to the family.

## DISPOSITION

The petition is denied.

AARON, J.

WE CONCUR:

McINTYRE, Acting P. J.

IRION, J.

11